# UNITED STATES MORTGAGE & TRUST COMPANY,
## Complainant,

*v.*

# CENTRAL SAN CRISTOBAL, INC., ET AL.,
## Dfts.

San Juan, Equity, No. 947.

FORECLOSURE OF MORTGAGE.

---

Title—Deed and Mortgage.

1. If a deed is executed contemporaneously with a mortgage, and the deed is placed on record before the mortgage, the title will be sufficiently in the mortgagor for the purposes of mortgaging the property.

New York Mortgage Law—Porto Rican Mortgage Law.

2. The Porto Rican law recognizes that instruments validly executed in foreign countries may be valid in Porto Rico. The burden is on the registrar of property to determine the point.

Acknowledgment—New York Law.

3. An acknowledgment is not necessary in New York to the validity of a conveyance. It is important only as a prerequisite to recording. The *lex reisitæ* governs the validity of the conveyance of land.

Mortgage—Porto Rican Law.

4. A mortgage must appear in a public instrument and is not complete until recorded. The Porto Rican notary is required to keep the original documents in a protocol and copies are recorded or registered; but papers executed in the United States before American notaries, whether they keep a protocol or not, are recordable in Porto Rico if they comply with the Porto Rican form of such papers and method of certification.

Registration—Effect.

5. Papers null under the law are not validated by admission to record, but in proper cases third persons are protected by registration. A third person is one not a party to the recorded instrument.

United States Mortg. & T. Co. v. Central San Cristobal.

Mortgage of Real Property—Inclusion of Personalty.

6. Personal property cannot be mortgaged in Porto Rico, but the inclusion of personal property in a mortgage of real property does not invalidate the instrument so far as relates to the realty. The common-law distinction of real and personal property approximately corresponds to the civil law distinction of immovable and movable property. Mortgage of immovable property covers some things appurtenant thereto, such as machinery.

Real Proper Mortgage—Appurtenances.

7. Mortgage of real property covers whatever is fairly a part of the land, and in the case of a sugar central this would embrace mills, machinery, leases, rights of way, and railroads still existing. Portable tracks, cars, engines, and the like are not covered. This is true whether expressed or recorded or not.

Fraud—Equity Jurisdiction.

8. Equity will look beyond the form of any transaction. There is nothing which can escape its ken, and no instrument or transaction too solemn for its investigation. It rests upon the plaintiff, however, to make out the proof of fraud to the satisfaction of the court.

Advances—Civil Code.

9. Advances under § 1823 of the Civil Code, paragraphs 1 to 6, are by the terms of § 1824 subject to the terms of the mortgage, unless recorded.

Defects—Estoppel.

10. Holders of mortgage bonds are estopped from setting up mortgages alleged to be connected with the issue of the bonds.

Mortgage—Mortgage Law.

11. Under the mortgage law, arts. 10, 11, and 111, the mortgagee is entitled to fruits and rents not collected.

Foreclosure—Bondholders' claim.

12. Before distribution of proceeds of a foreclosure sale it is necessary to determine who are the holders of the bonds, but this need not be determined before an order of foreclosure.

Opinion filed May 4. 1915.

United States Mortg. & T. Co. v. Central San Cristobal.

Statement of facts.

On June 29, 1914, the original bill was filed in this cause setting out that the complainant was organized under the laws of New York, and is a citizen of that state; that defendant Central San Cristobal, Inc., was organized under the laws of Connecticut, and is a citizen of that state; that A. R. O'Neill is a citizen of the United States residing in Porto Rico, and that Welch & Company is a corporation organized under the laws of California, and is a citizen of that state. That prior to July 1, 1910, the defendant Central San Cristobal, Inc., duly authorized the issue of bonds for $500,000, to be secured by a mortgage or a deed of trust, and that on said date the said defendant issued and delivered said bonds to the San Cristobal Sugar Company as part of the purchase price of certain properties, and that on the same date said principal defendant, being duly authorized, made and delivered to the complainant the said mortgage, a copy of which is made an exhibit to the bill. The mortgage describes the different pieces of real property, and includes buildings, improvements, machinery, apparatus, railroad, rolling stock, and leases of lands, which were also set out. The San Cristobal Sugar Company also executed the mortgage, appointing complainant representative of the bonds, and these bonds were issued for valuable consideration in accordance with the provisions of the mortgage, and are now outstanding in the hands of divers persons, who are the owners and holders thereof for value. The bill then goes on to recite the proceedings in the case of Welch & Co. v. San Cristobal in Connecticut and elsewhere, and the local receivership. That the semiannual instalment of interest due July 1, 1913, was

unpaid, and also that due on January 1, 1914, and default therein has been made. Another ground of the bill is that default has been made July 1, 1913, of the annual sum of $18,000 for the sinking fund, and similar default has been made as to the payment of rentals, and the defendant is insolvent and unable to pay its debts. Wherefore, under § 18 of article 8 of the mortgage law the complainant brings his bill of complaint. The mortgage exhibited with the bill is signed by the Central San Cristobal, Inc., by John P. Walsh, president, its corporate seal attached; the San Cristobal Sugar Company of New York, by M. W. Mumford, president, with its corporate seal; the United States Mortgage & Trust Company, by Calvert Brewer, vice president, and Victor Ehrlicher, assistant secretary, with its corporate seal, and witnessed by Edwin S. Lewis, Edward A. Carlin, and Manuel Muñiz Elazo, notary (150 New York county, New York), with his notarial seal. The mortgage purports to be made July 1, 1910; recites the appearance of the parties, and is in general in the Porto Rican form, the paper purporting to be executed in the presence of the notary, who certifies also to various facts as to the corporations. Towards the end of the instrument the notary further certifies that he "gave due notice to the appearing parties and the witnesses heretofore named, of the right which each of them had to read this instrument, each one for himself (which right was expressly waived by all of said persons), and read said instrument fully to them, explaining to each of them the meaning of the same, and they found the same correct and ratified it. Thereupon the appearing parties executed this instrument, the witnesses being Edwin S. Lewis and Edward A. Carlin, both of legal age and residents of this city, and having

United States Mortg. & T. Co. v. Central San Cristobal.

the legal capacity to act as such. And to all the foregoing, including my acquaintance with the appearing parties and the witnesses and their respective professions and residences, I hereby certify."

The bill was amended July 16, 1914, in certain particulars; answered July 20 by defendant San Cristobal, and had already been put in issue by defendant O'Neill.

On September 14, 1914, the answer of defendant Welch & Company was filed, denying much of the bill on information and belief, and in particlar that the bonds are valid and are in the hands of purchasers for value in good faith. For a separate answer and defense Welch & Company go on to allege (in the nature of a cross bill) that the bonds and mortgage sought to be foreclosed are not bona fide instruments as against Welch. That one P. G. Mumford, while the controlling spirit of the Central San Cristobal enterprises, obtained from Welch $300,-000 which he used to buy in the old San Cristobal corporations and assets for a new corporation, the Central San Cristobal, Inc., which issued the bonds in litigation as a bonus to its organizers without the payment of valuable consideration therefor. That Welch & Company made other advances to said defendant until the credit amounted to almost a million dollars.

In many respects the litigation in this suit ran along the same lines as that in No. 940 [post, 720], and finally by decree of this court on January 4, 1915, the two causes were consolidated. The evidence taken in the one case was made available in the other and the matter has been argued and submitted along this line. As the case at bar, however, is fully at issue between the parties, while No. 940 at present is before the court only in regard to one claim,—although the most important one,—the

opinions and decrees in the two branches of the consolidated case are stated separately as a matter of greater convenience for the present.

*Mr. J. Henri Brown* for complainant.

*Mr. Francis E. Neagle* for defendant Central San Cristobal, Inc.

*Mr. H. G. Molina* for defendant Welch & Company.

*Mr. Charles Hartzell* for receiver.

HAMILTON, Judge, delivered the following opinion:

This is a bill on the equity side of the court by the trustee under a mortgage alleged to have been executed by the defendant Central San Cristobal, Inc., seeking to foreclose on the ground of default in payment of interest and sinking fund, and otherwise. The alleged maker of the mortgage, the receiver, and Welch & Company, a large creditor of the principal defendant, and the Central San Cristobal, Inc., are made codefendants. The principal defendant makes no defense to the bill, nor does the defendant receiver. Defendant Welch & Company, however, set up a number of defenses which go to the validity of the mortgage, as to its execution, record, and consideration. It will be necessary, therefore, to consider the matter in some detail.

1. It seems from the evidence that the San Cristobal sugar enterprise was taken over by new owners and that the present mortgage was executed by the new corporation and the new securities used in part to pay for the property so taken over. It

United States Mortg. & T. Co. v. Central San Cristobal.

is set up by defendant Welch & Company that the deeds to the property were not recorded before the mortgage was made. This seems to be admitted, but the facts show that the deeds putting the property in the name of the defendant central were executed before, or at least contemporaneously with, the mortgage, and that these deeds were placed on record before the mortgage was placed on record. This would be sufficient to put the title in the defendant central for the purposes of making the mortgage in question.

2. Many of the difficulties in this case arise from the fact that the deeds and mortgage, particularly the latter, were executed in New York, where the controlling parties then were, while the property covered by these instruments lies in Porto Rico. The requirements of the laws of New York and of Porto Rico are different, but the law of Porto Rico recognizes the fact that transactions may be had outside of the Island which affect persons and property on the Island. §§ 9–11 of the Civil Code are as follows:

"Section 9. The laws relating to family rights and obligations, or to the status, condition, and legal capacity of persons, shall be binding upon the citizens of Porto Rico, although they reside in a foreign country."

"Section 10. Personal property is subject to the laws of the nation of the owner thereof; real property to the laws of the country in which it is situated."

"Section 11. The forms and solemnities of contracts, wills, and other public instruments are governed by the laws of the country in which they are executed.

"When such acts are authorized by diplomatic or consular officials of the United States abroad, the formalities established

United States Mortg. & T. Co. v. Central San Cristobal.

for their execution by the laws of the United States shall be observed.

"Notwithstanding the provisions of this and the preceding section, prohibitory laws relating to persons, their acts or property, and those which relate to public order and to good morals, shall not be held invalid by reason of laws, decisions, regulations, or agreements in force in any foreign country."

Article 5 of the mortgage law provides also: "The documents or deeds mentioned in article 2, which have been executed in foreign countries, and which are effectual in Spain in accordance with the laws, and such decrees as are mentioned in No. 4 of the same article, issued by foreign courts, which must be complied with in the Kingdom in accordance with the law of civil procedure, shall also be recorded in the registry." (In this it is necessary to read "Porto Rico" instead of "Spain.")

It is argued that the mortgage in question is valid under the laws of New York, and by the above sections will be held to be valid in Porto Rico.

Article 18 of the mortgage law is as follows:

"Registers shall determine, under their responsibility, the legality of the documents by virtue of which the record is requested, and the capacity of the parties interested by what appears from said documents.

"All the documents issued by judicial authorities shall also be determined by them under their responsibility, and for the sole purpose of admitting, suspending, or refusing their record or entry.

"There shall be no further remedies than those mentioned in this law against the suspension or refusal of a record or cautionary notice, judges or courts by virtue of judicial documents not

being permitted to compel the registers in any other manner to record or enter."

This imposes great difficulties upon the registrars.

"As in point of fact it is impossible that the registrar should know the forms and solemnities established in all countries of the world, it seems to us that he should only fix his attention on those that are common in civilized countries, that is to say, that he should assure himself of the certainty of execution by the persons that figure in the contract; that his execution has been made before a public officer, and that it is witnessed by at least two persons." Galindo, Commentaries, 24.

Nevertheless, it is a duty which must be discharged; and it brings up the question of what would be valid in this case under the New York law.

3. The requirements as to form and execution of mortgages in New York are defined in § 242 of the real property law, which is as follows: "When written conveyance necessary.— An estate or interest in real property, other than a lease for a term not exceeding one year, or any trust or power, over or concerning real property, or in any manner relating thereto, cannot be created, granted, assigned, surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the person creating, granting, assigning, surrendering or declaring the same, or by his lawful agent, thereunto authorized by writing. But this section does not affect the power of a testator in the disposition of his real property by will; nor prevent any trust from arising or being extinguished by implication or operation of law, nor any declaration of trust from being proved by a writing subscribed by the person declaring the same."

The general rule upon the subject is that "no particular form
is necessary to constitute a mortgage of land, nor is the employ-
ment of any precise formula of words essential to it.   It is
only requisite that the instrument should evince a present pur-
pose on the part of the grantor or mortgagor to convey the title
to specified real estate, sufficiently described, to a designated
person as mortgagee, to be held by the latter as security for the
payment of a certain sum of money or for the performance of
some other act on the part of the mortgagor.   .   .   .   And a
statute providing such a form is not exclusive of the common
law, so that a mortgage which would be good and sufficient if
tested by the common-law standards is not invalid merely be-
cause it does not conform to the statute." 27 Cyc. 1078, 1079.

If the New York law applies, the question of acknowledgment
*vel non* is not important.   Acknowledgment is not necessary to
the validity of a New York conveyance.   Strough v. Wilder,
119 N. Y. 530–535, 7 L.R.A. 555, 23 N. E. 1057.   The ac-
knowledgment is important only so far as it is a prerequisite
to recording.   On this subject it is provided: "Recording of
conveyances.—A conveyance of real property, within the state,
on being duly acknowledged by the person executing the same,
or proved as required by this chapter, and such acknowledgment
or proof duly certified when required by this chapter, may be
recorded in the office of the clerk of the county where such real
property is situated, and such county clerk shall, upon the re-
quest of any party, on tender of the lawful fees therefor, record
the same in his said office.   Every such conveyance not so re-
corded is void as against any subsequent purchaser in good faith
and for a valuable consideration, from the same vendor, his
heirs or devisees, of the same real property or any portion there-

of, whose conveyance is first duly recorded." Real property law of New York, § 291. .

Indeed, the notary seems to have made no attempt to comply with the form of acknowledgment set out in the New York real property law. Thus, §§ 303 of that law as to statements by the parties, 306 as to facts certified by the notary, and 309 as to form of the certificate itself, are not followed.

"The words 'execute,' 'executed,' and 'execution,' when used in their proper sense, convey the meaning of carrying out some act or course of conduct to its completion. Thus, when the terms are applied to a written instrument they include the performance of all acts which may be necessary to render it complete as an instrument importing the intended obligation, of every act required to give the instrument validity, or to carry it into effect, or to give it the forms required to render it valid; in a technical sense, the words necessarily include the performance of [3] three acts,—signing, sealing, and delivery, and in some instances the acknowledgment of the instrument; but the act of delivery is not always included; and not infrequently the terms are employed to express merely the acts of signing and sealing, or of signing only." 17 Cyc. 875, 876.

The general rule is unquestionably that a transfer of real property, whether absolute or conditional, must be in accordance with the *lex rei sitæ*, that is, of the place where the land lies. This is an ordinary rule of international comity or law, adopted in the United States as between the different states. The same principle will hold as to land situated in any territory of the United States, and not only is this true in principle as to Porto Rico, but the organic act expressly declares that the local law is to prevail, so far as this court is concerned, in Porto Rican liti-

United States Mortg. & T. Co. v. Central San Cristobal.

gation. This follows, therefore, unless there is something in the local legislation or in the nature of this claim which takes the matter out of the ordinary rule. This contract relates to Porto Rican land and must follow Porto Rican forms, both as to the mortgage and acknowledgment. If a New York acknowledgment had been used, the mortgage would not have been recordable in Porto Rico, because it involves an affidavit by the officers of the corporation. Civil Code of Porto Rico, § 1227; Andreu & Co. v. Registrar of Property, 20 P. R. R. [396] 421 (Spanish). The general rules as to Porto Rican acknowledgments must apply to conveyances of Porto Rican land executed outside of Porto Rico. Code of Civil Procedure, § 600; Law of Evidence, § 94. The law of Porto Rico governs as to the requisites for the authentication of conveyances of Porto Rican land. This is the general rule as declared by Wharton: "It is scarcely necessary to say that when the *lex situs* makes the validity of a document to depend upon a certain mode of acknowledgment and registry, those conditions must be complied with. Their omission cannot be made good by the most solemn modes of attestation and registration adopted by the state from which the document emanates." Wharton, Confl. L. 2d ed. § 275f.

4. Questions arise in this case under Porto Rican law relative to the form of the mortgage and as to the mode of its execution. These will be considered separately. A mortgage in Porto Rico is governed by several laws which have come down from Spain. Ordinary civil relations are regulated by the Civil Code, and as to mortgages § 1781 of this declares: "The form, extension, and effects of the mortgage, as well as all that relating to its creation, modification, and extinction, and all that

which may not have been included in this chapter, shall be subject to the provisions of the mortgage law, which continues in force."

Section 1247 of the same Code, as amended in 1912 (Acts, p. 109), declares that "the following must appear in a public instrument: 1. Acts and contracts the object of which is the creation, conveyance, modification, or extinction of property rights on real property."

Subsequent consideration will be given to the question of what can be mortgaged, that is to say, whether anything can be included except real property. For the present, the general question of the form of the instrument will be considered.

A mortgage is not complete until it is recorded. Article 146 of the mortgage law provides:

"In order that voluntary mortgages may be validly constituted it shall be necessary:

"1. That they have been agreed to or ordered constituted by a public instrument.

"2. That the deed shall have been recorded in the registry established by this law."

The general rule as to mortgage, therefore, is that it must be by a public instrument. The public instrument is defined by the civil law in this manner: "Section 1184. Public instruments are those authenticated by a notary or by a competent public official, with the formalities required by law."

Being executed before a notary, this incorporates in the transaction also the provisions of the notarial law. According to this, we find that § 1 (Compilation, § 1979) says: "Notaries are the only officials authorized to certify contracts and other extrajudicial instruments that are executed in their presence in accordance with law."

VII. Porto Rico—45.

United States Mortg. & T. Co. v. Central San Cristobal.

Copies are furnished by the notary upon request, and one of these is registered or recorded. Notarial law, §§ 23–25, provides:

"Sec. 23. By copy is understood a literal transcript of an instrument executed before a notary which the latter, or the person who is lawfully in charge of the protocol, issues to the person requesting the same."

"Sec. 24. Every copy of a public instrument shall state with precision the location of the protocol and the number assigned to it in the original, and shall be issued under the mark, signature, and rubic of the notary in charge of said protocol, and bear a 50-cent internal revenue stamp."

"Sec. 25. Upon issuing a copy, the fact shall be recorded in a memorandum placed at the foot or in the margin of the original document from which it is taken, wherein shall be stated the name of the person to whom issued and date of issuance thereof. Said memorandum shall be signed by the notary."

The notary is compelled to keep the original documents in his office in a file or collection which is called a protocol. Notarial law, § 28: "A protocol is the collection, in proper order, of original documents authenticated during one year by a notary."

To summarize, therefore, the Civil Code (§ 1781) requires the form of the mortgage to be as defined in the mortgage law; the mortgage law (art. 146) says that such a paper must be what is called a public instrument; the Civil Code (in §§ 1184 and 1247) defines a public instrument as one authenticated by a notary, and finally a record is necessary to a mortgage in Porto Rico (Civil Code, § 1875). The defendants' contention is that the mortgage in this case was not properly executed or recorded under these requirements, and is not binding upon defendant

United States Mortg. & T. Co. v. Central San Cristobal.

Welch & Company. This draws attention to the difference between the notarial law of Porto Rico and that of the American states. In America, outside of Louisiana, a notary is merely an officer to identify and examine signers of papers and thereby qualify such papers for public record. In Porto Rico, and also in Louisiana, on the other hand, a notary is in a much higher sense a public official, one who draws and preserves original public documents. He furnishes a copy only, from which the recording officers derive what is put of record, but himself retains the original papers, binding them in manuscript volumes called "protocols." The protocol goes back apparently to the Spanish real pragmática of June 7, a. d. 1503. Protocol means "first collation," and the notary's office was a public one long before the modern system of recording. Diccionario Razonado de Joaquin Escriche. The notary still reports an index of each week's work to the local supreme court and is subject to regular visitation. For matters of notice, however, the protocol has practically yielded to the record office.

Supposing, therefore, that, according to the Porto Rican law, a mortgage must be so executed before a notary public to be valid in Porto Rico, is it possible for a mortgage to be executed outside of Porto Rico that would be valid within Porto Rico? Porto Rico, of course, cannot prescribe the powers of a notary in New York and compel him to keep a protocol, but it can, within certain limits, define what kind of papers executed in New York shall be valid in Porto Rico. Under the American system it is doubtful if Porto Rico could declare that no document should be valid in Porto Rico unless executed here. This would be building a Chinese wall around the Island which would hardly be compatible with American institutions; and yet such would be

United States Mortg. & T. Co. v. Central San Cristobal.

the result if papers could only be executed before a Porto Rican notary. It will not be presumed that the local legislature intended this, and in fact it has provided otherwise to some extent, when, in the Political Code, §§ 163–165, it authorizes the appointment of commissioners of deeds in the United States. Unless these are numerous, however, the practical result would be the same.

It must be considered, therefore, that the law intends papers executed in the United States before American notaries, whether they keep a protocol or not, are recordable in Porto Rico, provided they comply with the Porto Rican form of such papers and with the Porto Rican method of certification by the notary.

In the case at bar this was done. The mortgage is substantially according to the Porto Rican form, and the certification by the notary complies with Porto Rican requirements. The fact that he did not read over to the parties a paper they said they had read, and the fact that a party could not understand the Spanish copy, which he had satisfied himself conformed to the English, and does conform to the English, were waived by the parties in interest and are not material.

The supreme court of Porto Rico has within the past few days, in Colón Muñiz v. Registrar, an administrative appeal, made a deliberate election to conform in matters of foreign execution to the American view of the *lex rei silæ*. They declare that they will consider "the rights, interest, and convenience of our own citizens in the light of our present political status and future commercial relations under new conditions brought about by the recent change of sovereignty, rather than the intrinsic merits of this or that theory viewed in the abstract." They recognize as commendable the "tendency of the Louisiana supreme

court to conform to common-law standards and to align its rules of decisions with those of the other states and of the Supreme Court of the United States, in so far as consistent with the fundamental principles of the special and exceptional system of the local laws there in force, in many respects substantially identical with our own."

The New York notary certifying the mortgage in question, therefore, properly followed the Porto Rican requisites, and the registrar acted correctly in recording the mortgage.

5. In point of fact, moreover, whether the mortgage should have been recorded or not, it was recorded. What was the effect of this?

A registrar under the Torrens system, as here, occupies a different position from the probate judge or other recording officers of most of the American states. Such an American officer must record almost anything that is presented to him for that purpose, leaving the effect of it to the individuals affected. In Porto Rico it is otherwise. Under the mortgage law, art. 18, the registrar is in such respects a judicial officer. He becomes more expert than a judge of regular courts of justice, and his decision is entitled to great weight. Appeals are allowed from his decision to the local supreme court, and many decisions on such points are found in the Porto Rico Reports.

Nevertheless, under art. 33 of the mortgage law, "instruments or contracts which are null under the law are not validated by their admission to record." There follows an exception in article 34 of the mortgage law, which is as follows:

"Notwithstanding the statements contained in the preceding article, the instruments or contracts executed or covenanted by a person who, according to the registry, has a right thereto,

shall not be invalidated with regard to third persons, after they have once been recorded, although later the right of the person executing them is annulled or determined by virtue of a prior deed not recorded, or for reasons which do not clearly appear from the registry."

"Only by virtue of a recorded instrument may another later instrument, also recorded, be invalidated to the prejudice of third persons."

A third person, for the purposes of the mortgage law, is one who has not been a party to the recorded instrument or contract. It has been held, however, that no one can be considered as a third person who, although not having taken part in the instrument recorded, had knowledge at the time of the acquisition of the property of the encumbrances existing upon the property. Carmona v. Cuesta, 18 P. R. R. 178. Under the mortgage law, articles 65 and 110, papers with curable defects are recordable and are notice. Under article 65 this applies also to third parties. The general rule is that, unless they are void, instruments admitted to record affect third parties with notice. The mortgage in question is not void, and therefore affected the defendants with notice.

6. Apart from the matter of execution and notice, objection is made to the contents of the mortgage as a Porto Rican instrument in that, besides the land, the mortgage includes personal property, which is not subject to mortgage in Porto Rico. At most, however, this would not constitute any defect so far as relates to the real property. The mortgage would still be valid against the lands.

As to whether all the property mentioned is subject to mortgage deserves fuller consideration. What can be mortgaged is

fixed by the Civil Code, §§ 1775 and 1778, which are as follows:

"Sec. 1775. The following only can be the subject of a mortgage contract:

"1. Real property.

"2. Property rights in real estate which can be alienated in accordance with law." (This would include leases.)

"Sec. 1778. A mortgage includes the natural accessions, improvements, growing fruits, and rents not collected when the obligation is due, and the amount of the indemnities granted or due the owner by the underwriters of the property mortgage, or by virtue of the exercise of eminent domain by reason of public utility, with the declarations, amplifications, and limitations established by law, in case the estate continues in the possession of the person who mortgaged it, as well as when it passes into the hands of a third person."

Further legislation is found in articles 106 and 108 of the mortgage law, which are as follows:

"Art. 106. The following only are mortgageable:

"1. Real Property.

"2. Property rights in the realty, alienable in accordance with the laws."

"Art. 108. The following are not mortgageable:

"1. Growing crops and unpaid rents, separated from the estate which produces them.

"2. Chattels permanently located in buildings, either useful or ornamental, or for the service of some industry, unless they are mortgaged together with said building.

"3. Public offices conferred by the Crown (oficios públicos).

"4. Bonds of the state debt, or of provinces or towns, and

United States Mortg. & T. Co. v. Central San Cristobal.

the obligations and stocks in banks, corporations, or companies of any kind.

"5. The property right in things, which, although they will be owned in the future, are not yet recorded in the name of the person who will have a right to own them.

"6. Servitudes, unless they are mortgaged together with the dominant estate, and excepting in any case that of water, which may be mortgaged.

"7. The right of use which the law allows fathers or mothers in the property of their children and the surviving spouse in the property of the deceased.

"8. Use and occupation.

"9. Mines, if a definite title thereto has not yet been obtained, even if they are situated within one's own property."

The common-law distinction of real and personal property corresponds more or less to the immovable or movable property of the civil law. What is embraced under the term "immovable" is declared in the Civil Code, § 335. Mortgageable property is not strictly confined to lands, or even to the buildings affixed to the land. There are some classes of property, otherwise movable, which, when a part of an agricultural or other enterprise, are subject to mortgage with the land, as in article 108 of the mortgage law, copied above, and article 111 of the same law, which is as follows:

"In accordance with the provisions of the preceding article, the following shall be considered mortgaged together with the estate, provided they belong to the owner of the estate, although they are not mentioned in the contract:

"1. Chattels permanently located in a building, either useful

or ornamental, or for the service of some industry, even though they were placed there after the creation of the mortgage.

"2. Improvements, consisting of new plantings, works of irrigation and drainage, repairs, works for safety or alterations, comfort, ornamentation or raising of buildings, and any other similar works, which do not consist of additions to the land, except natural accretions, or in the new construction of buildings, where previously none existed.

"3. Crops, which at the time the obligation falls due, are growing on the trees and plants, or have already been harvested, but not yet removed or warehoused.

"4. Rents due and not yet paid, whatever may be the reason they have not been collected, and such as shall have to be paid until the creditor has recovered his whole credit.

"5. Indemnities awarded or due the owner of the mortgaged realty, either for the insurance thereof or for the crops, provided the damage occurred after the creation of the mortgage, or on account of condemnation of the land by the right of eminent domain."

The list of the property in the hands of the receiver shows property of this character.

Law varies with the community affected, and in an agricultural district, property, elsewhere personal, is often regarded as part of a farm. Everywhere water is essential to the cultivation of crops, and in some parts of Porto Rico land is practically valueless without irrigation waters. The same to some extent is true of draught cattle, machinery, and even tools. The Spanish law in this regard goes back to the most ancient form of Roman law, that before the XII. Tables, where *res mancipi* embraced as real property, so to speak, cattle and other things

which in modern times have been regarded as entirely distinct. Justinian abolished the distinction of *res mancipi* and *nec man-cipi,* and substituted the principle that things in a building for permanent use are a part of it (Title 1, Dig. Lib. 19, lex 17, § 7). Justinian's legislation, being after the Fall of Rome, was not binding in Spain, and the Visigothic Code is silent. The Partidas considers as immovable everything commonly used (todas cosas acostumbradas) for the service of the house. Part. 5, title 5, ley 28. The Spanish commentator, Manresa, mentions roads and railways as property subject to mortgage. Manresa, 3 Com. 19, 23–25. Do the light service railways of sugar plantations, which are often readily movable, and in point of fact are meant to be moved from place to place on a plantation, go with the mortgage of the plantation with which they are used?

The law is not confined to houses, but extends to land. Civil Code, § 335 (Spanish, § 334) covers that "machinery, vessels, instruments, or implements intended by the owner of the tenement (finca for the industry or works that he may carry on in any building or upon any land (heredad), and which tend directly to meet the needs of the said industry or works." This would in the case of a sugar central property include the mill and grinding machinery and its accessories.

7. This covers the matter of what is real property or immovable, what goes with the land in question as a part of it. It does not, however, cover the question of record. It is quite possible that some things in the nature of fixtures as between the grantor and grantee, or their privies, pass with the land; but only what was in the record, or fairly deducible from a record, would, under the mortgage law, bind third parties.

United States Mortg. & T. Co. v. Central San Cristobal.

In this case it is agreed that the first mortgage in suit was recorded *in ipsissimis verbis*. According to this, therefore, some things which otherwise would be personal property were put of record as part of the property mortgaged. But, unless these things so put of record were what should have been recorded under the law, the record will nevertheless not be notice to third parties. The record law does not provide for liens on anything but realty, but really covers whatever is fairly a part of the land, and in this case would embrace mill, machinery, leases, rights of way, and railroads mentioned in the mortgage and now existing. Notice is implied of these as part of the land mortgaged, whether expressed on the record or not, and on the other hand portable tracks, cars, engines, and the like are not part of the land, and even if expressed and recorded, are not included in the mortgage.

It would be going too far under modern conditions, however, to hold that personal property like locomotives, railroad cars, and carts, designed to be moved, and draught and other cattle, which not only are movable, but subject to accident and destruction of various kinds, should be included under any definition of immovable property and held to be mortgaged with land. The civil law is one which expresses either directly or by fair intendment everything that is covered by it, and in the opinion of the court the words used in § 335 of the Civil Code cannot be stretched so as to include these latter articles in a mortgage.

8. Much of the discussion of this case is devoted to the question of fraud on the part of the projectors of the company in issuing the mortgage and bonds now sought to be foreclosed. This would apply even if the mortgage is perfectly valid in form in Porto Rico. Equity will look beyond the form of any trans-

action; there is nothing which can escape its ken. There is no instrument or transaction too solemn for its investigation. If a mortgage is issued in fraud of creditors, it will not be enforced when their rights are involved.

The fraud alleged is as follows: The owners of the original San Cristobal sugar enterprise in question had, on account of difference of opinion as to procedure, become so hostile to each other that the enterprise was threatened with ruin. P. G. Mumford conceived the idea of buying out his opponents, and for this purpose secured a loan from Welch & Company of $300,-000, alleging that it was to be used for that purpose. This amount was accordingly so used. The mill and its appurtenances were bought in, new corporations organized, and the mortgage in question issued. Defendants Welch & Company allege that they were deceived by Mumford in this matter in that he represented the whole plant to be worth a million and a half dollars, when in point of fact it has turned out to be worth much less; that, in consequence, there is not enough property to return Welch & Company the money advanced over and above the mortgage in question, and that in fact the bonds went to Mumford and associates as a bonus. The contract of purchase was dated May 17, 1910, and shows that the Central San Cristobal of Connecticut was to receive $700,000, about half in first mortgage bonds and the remainder in three money payments, and the purchasers assumed the indebtedness of the two subsidiary companies, amounting to about $250,000. The properties of the two subsidiary corporations were then sold to a new corporation, the defendant Central San Cristobal, Inc., and a part of the payment therefor was $500,000 in bonds secured by the mortgage now in litigation. The Connecticut corporation re-

ceived $392,000 of the first mortgage issue. The second mortgage issue of $182,000 was to secure different payments provided for in the above contract. The remaining $108,000 of first mortgage bonds went into the treasury of the Central San Cristobal, Inc., and Mumford and Church, the promoters, received stock to that amount without paying money therefor.

It is shown by the evidence that a sugar man in Porto Rico offered $850,000 for the San Cristobal properties in 1910, and that this offer was declined, and also that Mumford at least considered the property worth upwards of $1,600,000.

There is some evidence that a good many of the details were known to Welch, and it cannot be said that defendant Welch & Company have made out their claim of fraud. It would seem to have required about the amount loaned to make the cash payments required by the reorganization, and it is not at all clear that the value of the property was misrepresented. It may be that there was an error in judgment as to valuations, but it was as to a matter which could be investigated by each side, and the facts do not convince the court that there was fraud in this respect.

9. Defendants Welch & Company also set up that they have a lien for advances superior to the mortgage. Such a lien would seem to be claimed, if at all, under paragraphs 1 and 6 of § 1823 of the Civil Code. This subject has been more fully discussed in the opinion in the other branch of the case, but for the present it may be added that such a lien under any section of the Civil Code, as, for instance, paragraph 4 of § 1824, cannot prevail against a mortgage, unless it is recorded in some form. Mortgage law, arts. 24, 59–64. There is no evidence of any such record which would confer the statutory lien, while,

on the other hand, the invalidity of the mortgage on account of fraud has already been discussel.   It may be that Welch & Company expected to make their profit out of the agency for the sale of San Cristobal sugars shipped to them.   It has turned out that Welch & Company insufficiently protected themselves, but for this the fault lay with themselves.

10. The point is raised, however, that, whatever may be the technical defects of the mortgage now sought to be foreclosed, Welch & Company are estopped from denying its validity. Welch & Company are the holders, and in this litigation seek to enforce their right to some ninety of the bonds in question.  They cannot be permitted to say that their bonds are valid and that other bonds of the same issue are invalid.   Furthermore, Welch & Company in the other branch of this suit, and also in the present branch of it, while they deny the validity of the mortgage, seek at the same time to have subjected to their claim the lands and property which were acquired by deed for the purpose of the mortgage.   In so doing they acknowledge and ratify the title of the San Cristobal corporations to the property which is the subject of the mortgage.   If the San Cristobal corporations own no property, it would make no difference whether there was a mortgage or not, for there would be nothing to mortgage, and particularly there would be nothing which, on the failure of the mortgage, would be subject to the claim of Welch & Company. The argument of Welch & Company is that the San Cristobal corporations did acquire the property in question, and in fact that they acquired it with the money of Welch & Company, or that, by liens and other proper ways, this property became subject to the claim of Welch & Company.   The evidence shows that whatever property the San Cristobal corporations acquired

was so acquired by deeds drawn in the same manner as the mort-- gage now assailed, acknowledged before the same notary as was the mortgage, and recorded in the same way and in the same reg-- istries as the mortgage. Welch & Company, therefore, cannot be· permitted in equity to blow hot and cold with the same breath; to say that the land belongs to the Central San Cristobal for the· purpose of subjecting it to the Welch claim, and yet deny the validity of the mortgage, which stands upon exactly the same basis so far as forms of acquisition are concerned.

It follows, therefore, that the opposition of Welch & Company· to the mortgage cannot be sustained.

11. The facts of the case show that the complainant is enti- tled to relief as to income going with the mortgage. The mort-- gage law, in arts. 10 and 11, makes the mortgagee entitled to· fruits and rents not collected at the time the bill was filed for· foreclosure, and those which matured afterwards. 27 Cyc. 6830. Mortgage law, art. 111, paragraph 4, declares: "4.. Rents due and not yet paid, whatever may be the reason they· have not been collected, and such as shall have to be paid until the creditor has recovered his whole credit."

The exact amount due under these provisions cannot be stated without further evidence or a reference.

12. The result of this will be that whatever claims Welch· or other creditors may have to particular bonds will be settled upon the distribution of the proceeds of sale. Before this is, made it will be necessary to determine who are the holders of the bonds, and that question need not be determined at present. It may be that some of the apparent holders will be declared to· hold them in trust for creditors, or the bonds will be found to·

be in the hands of bona fide purchasers for value. This will be the subject of a reference and decree at the appropriate time.

It follows, therefore, that the mortgage sued on is valid, that default has been committed by the defendant Central San Cristobal, Inc., and that a decree of foreclosure should be entered in the usual form. It is so ordered.